**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| JEAN RIVERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-cv-01017-TWP-MPB |
| | ) | |
| GOODWILL OF CENTRAL AND SOUTHERN INDIANA, INC., | ) ) ) | |
| | ) | |
| Defendant. | ) | |

### ENTRY GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on Defendant Goodwill of Central and Southern Indiana, Inc.'s ("Goodwill") Motion for Summary Judgment ([Filing No. 35](#)). After Goodwill denied her a promotion and later terminated her employment, Plaintiff Jean Rivers ("Rivers") filed an Amended Complaint alleging gender discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964. ([Filing No. 11](#).) For the following reasons, the Court **grants** Goodwill's Motion for Summary Judgment.

### I. BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Rivers as the non-moving party. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Goodwill is a non-profit organization that serves individuals who face challenges or obstacles to gaining employment. ([Filing No. 37-1 at 16](#).) It does this in part by using the proceeds of its retail sales to eliminate barriers to employment. *Id.* Goodwill of Central and Southern Indiana is divided into various divisions, one of which is its Retail Division, comprised of approximately

70 retail stores that sell donated items in the Indianapolis area. *Id.* at 18-20; Filing No. 37-2 at 2; Filing No. 37-3 at 62. Goodwill also maintains an Outlets and eCommerce Division, consisting of four outlet stores and an eCommerce facility. (Filing No. 37-1 at 22; Filing No. 37-2 at 2; Filing No. 37-4 at 27-28.) The Outlet stores sell items that were once on sale at a retail store but were not purchased. (Filing No. 37-1 at 20.) Goodwill's online platform, known as eCommerce, is where donated items are sold online and shipped from Goodwill's lone eCommerce facility. *Id.* at 20-22. That lone eCommerce facility is referred to "Clickgoodwill". (Filing No. 37-4 at 27.)

Goodwill hired Rivers in May 2005, as a store manager for one of its retail stores.[1] (Filing No. 37-1 at 23-24, 158.) As store manager, she was responsible for managing employees and store standards, ensuring sales targets were met, and scheduling. *Id.* at 25-26. Rivers was eventually promoted to the position of regional retail director, in which she oversaw multiple retail stores. *Id.* at 26-28. In 2013, Rivers was promoted to be director of eCommerce, a position she held until her employment ended. *Id.* at 29-31. As director of eCommerce, she reported to the Senior Director of Outlets and eCommerce, Tim Cooper ("Cooper"), who reported to the Vice President of Retail, Eric Schlegel ("Schlegel").[2] *Id.* at 34-35. Cooper, who had promoted Rivers to the regional retail director position, also decided, in consultation with Schlegel, to promote Rivers to the director of eCommerce position. (Filing No. 37-4 at 98-99.)

Starting in 2013 when she became director of eCommerce, Rivers' performance was evaluated by Cooper. (Filing No. 37-1 at 35, 148.) In her 2015 evaluation, Cooper had many complimentary things to say, including that "[Rivers] lead (sic) her team to remarkable results in 2015" and that "[Rivers] continues to be an extremely high performer and someone I convey as

---

[1] Rivers was hired by Goodwill of Central Indiana, Inc., which merged with Goodwill of Southern Indiana on January 1, 2017.

[2] In 2016, Schlegel's job title changed to Vice President of Retail, Facilities and Risk Management.

one of the top in her peer group." *Id.* at 233. However, Cooper identified that Rivers needed improvement in "Strategic Work Relationships" and "Communication." *Id.* at 239.

In her 2016 evaluation, Cooper wrote "[Rivers] completed 2016 in what will go down as a tremendous financial year, as eCommerce will atain (sic) all-time highs for contribution margin (34%). This is a direct result of the efforts [Rivers] has lead (sic) for financial growth." *Id.* at 242. Under the "Disappointments" section of the evaluation, Cooper wrote, "For [Rivers,] as her role expands it require (sic) she continue to find strategic ways to work through others to accomplish over-arching goals." *Id.* at 243. Rivers admitted in her deposition that she could have done a better job building strategic relationships during 2015 and 2016. *Id.* at 46-62.

In June 2017, Cooper, who at that time served as Goodwill's Senior Director, Retail Outlets and eCommerce, announced he was being promoted to Goodwill's Corporate headquarters in Colorado and was leaving his position. *Id.* at 103; Filing No. 37-6 at 4. The Senior Director, Retail Outlets and eCommerce is responsible for overseeing the sales, service, merchandising, and operations of Goodwill's outlet stores and eCommerce facility. (Filing No. 37-6 at 2.) That person is also responsible for supervising, evaluating, and coaching management staff, along with leading new project initiatives through development to completion and launch. *Id.* Building strategic relationships is a skill Goodwill deems necessary to successfully do the job of Senior Director, Retail Outlets and eCommerce. *Id.*; Filing No. 37-4 at 41; Filing No. 37-8 at 4. Goodwill solicited applications within the company to fill the Senior Director role Cooper would be vacating. (Filing No. 37-8 at 4.)

Including Rivers, six Goodwill employees applied for the position: (1) Karin Molt (female), (2) Stephen Genco (male), (3) Brodie Sears (male), (4) Rivers (female), Kenny Felkner (male), and (6) Troy Culver (male). (Filing No. 37-4 at 30.) More than forty external candidates

also applied. ([Filing No. 37-8 at 4](#).) Senior Director of Talent Valerie Nowosielski ("Nowosielski") screened the internal candidates, some of whom would move on to interview with a panel that recommends who should receive the senior director job. *Id.* at 3. As part of the initial screening, Nowosielski sought recommendations from each of the six internal candidates' direct supervisors. *Id.* at 2.

Cooper, who was Rivers' direct supervisor at the time, filled out her recommendation form. ([Filing No. 37-4 at 116](#).) He rated her on a scale of one to five[3] in six areas of competency, giving her a 5 in Strategic Thinking, Innovation, Business Acumen, and Stewardship, and a 3 in Developing Others and Building Strategic Working Relationships. *Id.* at 116-17. Cooper wrote that Rivers is a "strategic thinker" but that she will "need to develop better strategic relationships with support departments." *Id.* at 117-18. Cooper also evaluated Brodie Sears ("Sears"), who was Goodwill's Director of Donation and Acquisition Supply Chain, and is the applicant who ultimately received the promotion to the senior director position. ([Filing No. 37-8 at 4](#).) Cooper rated Sears a 5 in the categories of Strategic Thinking, Building Strategic Relationships, and Stewardship, a 4 in the categories of Developing Others and Business Acumen, and a 3 in Innovation. ([Filing No. 37-4 at 119-20](#).)

After receiving recommendations from the internal candidates managers, Nowosielski conducted initial telephone interviews with the six internal candidates and offered recommendations to Schlegel on whom she believed should move forward in the interview process. ([Filing No. 37-8 at 5](#).) Nowosielski preferred Sears for the senior director position. *Id.* Sears was "the only candidate [she] felt strongly enough to recommend moving forward to panel interviews." *Id.* Nowosielski noted that Rivers was "incredibly smart" but "that the obstacle to

---

[3] The scale defined a score of 1 as "much less than acceptable," a score of 3 as "acceptable," and a score of 5 as "much more than acceptable." ([Filing No. 37-4 at 116](#).)

4

her success is her inability to be self aware and recognize the importance of adjusting her communication style to her audience in order to build strong relationships," and that Rivers did not realize this shortcoming. *Id.* at 28. Nowosielski noted that Rivers "needs BIG coaching in this area" and that he'd "heard this to be her weakness the entire time I have been at Goodwill and it has not gotten better." *Id*.

Schlegel also solicited feedback from the departments of Loss Prevention, Facilities, and Human Resources at Goodwill. Each department head favored Sears over Rivers for the senior director position. (Filing No. 37-4 at 123-34.) Based on these recommendations, Schlegel selected four internal candidates, including Rivers and Sears, for interviews with the selection panel. *Id.* at 54-55.

The panel consisted of a diverse group of Goodwill employees, including female executives of Goodwill, from different departments of the company. Rivers and two other internal candidates participated in an interview before a panel on July 19, 2017. (Filing No. 47-4.) Sears underwent an interview on August 3, 2017, with a panel that was not made up entirely of the same individuals as the July 19th panel. *Id.* Candidates gave a fifteen-minute presentation, the topic of which was the future of eCommerce. (Filing No. 37-8 at 6.) Candidates then rotated among smaller groupings of three to four panelists answering questions aimed at assessing their fitness for the senior director position. *Id.*

Following Rivers' interview, the panelists discussed her candidacy, noting she had a broad vision for eCommerce, a high level of technical knowledge, and was a "strong tactical role player." *Id.* at 33; Filing No. 37-7 at 5. The panelists also commented that Rivers was the "least mission focused" (Filing No. 37-7 at 5) of the candidates and they believed she "could struggle with building strong working relationships." (Filing No. 37-8 at 33.) The panelists generally thought

more highly of Sears, and especially noted that he "works to build strategic relationship (sic) and demonstrates a high level of emotional intelligence." (Filing No. 37-7 at 6.)

In a discussion following the panel interviews, Cooper explicitly recommended to Schlegel that he select Sears over Rivers for the position. (Filing No. 37-4 at 39-41; Filing No. 37-6 at 4-5.) The idea that the person who supervised both Sears and Rivers had recommended Sears was notable to Schlegel. (Filing No. 37-7 at 3.) After receiving this feedback from the various actors involved—Goodwill department heads, Nowosielski, Cooper, and the panel—Schlegel determined Sears would be offered the position. (Filing No. 37-3 at 35-36.)

On August 8, 2017, Schlegel met with Rivers to explain that she was not selected for the promotion. During the conversation, he discussed with Rivers that the panel noted building strategic relationships was an area of her weakness. When Rivers inquired further, Schlegel could not provide a specific example. (Filing No. 37-1 at 111-12.) Rivers told Schlegel that she did not realize this "arbitrary feedback" could limit her advancement at Goodwill, and that she would have preferred to be informed of these perceived deficiencies when they occurred rather than when she was applying for a promotion. (Filing No. 47-4 at 4.) Schlegel told Rivers that much of the panel's feedback, including work on her latest project, was very positive. *Id.* Rivers inquired and Schlegel informed her that Sears had received the promotion. (Filing No. 37-1 at 114.) Rivers admittedly got "really emotional," and ended the conversation. *Id.*

That evening, Rivers requested via e-mail to take some time off work and Schlegel responded that would be no problem. (Filing No. 47-7 at 4.) Rivers was not at work for the rest of that week, August 9 through 11, 2017. During this time, she spoke to Schlegel by telephone and informed him that she was unsure of whether she planned to continue working at Goodwill. (Filing No. 37-1 at 120.) During that conversation she is 90% certain that she told Schlegel there

was a "good old boys club" at Goodwill (Filing No. 37-1 at 116-117). Rivers also asked if she could report directly to Schlegel rather than to Sears. *Id.* at 128. Schlegel declined this request. *Id*. Rivers returned to work the following Monday, August 14, 2017. *Id.* at 134.

Sears believed the success of his new position would be dependent on his direct reports fulfilling the obligations he provided in his new position. (Filing No. 37-3 at 40.) Therefore, he posed a question to all of his new reports concerning the ability to accept his new position as their supervisor. Following her return to work, Rivers met with Sears in person and by telephone. (Filing No. 37-1 at 134-135.) Sears informed Rivers that he was willing to help her with whatever she needed. In a face-to-face conversation Sears asked "do you accept that I'm in this role?" and Rivers responded, "no, not until I get some confirmed answers on why you got the job." (Filing No. 37-1 at 137)[4]. Sears understood this answer to constitute insubordination and reported the conversations to Schlegel. (Filing No. 37-3 at 64-65.) Schlegel advised Sears to try to work out the problem with Rivers. (Filing No. 37-4 at 86-88.) Sears made the decision to terminate Rivers based on her refusal to work for him, citing her insubordination as his reason for doing so. (Filing No. 37-3 at 69.) Rivers was informed of Sears decision on August 25, 2017. (Filing No. 37-2 at 5.) At that time, a human resources representative informed Rivers that the reason for her termination was her unwillingness to accept Sears as her manager. *Id.*

Rivers initiated this action on April 3, 2018. (Filing No. 1.) She filed an Amended Complaint on April 30, 2018. (Filing No. 11.) She raises two claims: gender discrimination in violation of Title VII of the Civil Rights Act of 1964 and retaliation in violation of the same title. *Id.* at 4. She requests injunctive relief—to reinstate her employment and promote her to the senior

---

[4] Sears recalls that he first asked Rivers in a telephone conversation "do you accept that I'm in this role?" and Rivers responded, "absolutely not." (Filing No. 37-3 at 38). Rivers disputes this conversation. Because the Court accepts all facts in the light most favorable to Rivers, the Court only considers one conversation.

7

director position that she was denied. Rivers also seeks lost wages, compensatory and punitive damages, attorney's fees and costs. *Id.* at 5. Goodwill filed a Motion for Summary Judgment on April 18, 2019, arguing that Rivers cannot establish a *prima facie* claim for either discrimination or retaliation. ([Filing No. 35](#).) ([Filing No. 36](#).)

## II.     LEGAL STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489-90 (7th Cir. 2007). A disputed fact must be "material," which means that it might affect the outcome of the case under the applicable substantive law. *Liberty Lobby*, 477 U.S. at 248. Disputes over irrelevant or unnecessary facts do not preclude summary judgment. *Id*. A genuine dispute of material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249.

In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of

8

material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox Cnty. Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

## III. DISCUSSION

Rivers alleges that by failing to promote her, Goodwill "violated her rights and discriminated against her because of her female gender in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et seq.*" ([Filing No. 34](#).) She also alleges Good will retaliated against her when she complained about the discrimination. *See* 42 U.S.C. § 2000e-3(a). The Court will first address Rivers' discrimination claim, then turn to her retaliation claim.

**A.** **Discrimination**

Title VII makes it unlawful for anyone "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges or employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The legal standard is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action. *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 764 (7th Cir. 2016). Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the "direct" evidence does so, or the "indirect" evidence. *Id*. Relevant evidence must be considered and irrelevant evidence disregarded, but no evidence should be treated differently from other evidence because it can be labeled "direct" or "indirect." *Id.* The sole question that matters is whether a reasonable juror could conclude that Rivers would have kept her job if he had a different gender, and everything else remained the same. *Id*. (citing *Anchor*

*v. Riverside Golf Club* 117 F.3d 339, 341 (7th Cir. 1997), *Troupe v. May Department Stores Co.*, 20 F. 3d 734 (7th Cir. 1994)).

In its summary judgment brief, Goodwill argues this claim fails for two reasons: (1) Rivers "cannot establish a *prima facie* case," and (2) "because Goodwill had legitimate, nondiscriminatory reasons for choosing Mr. Sears for the Senior Director position (*i.e.*, [Rivers] cannot establish pretext)." (Filing No. 36 at 19 (emphasis deleted).) The Court will address these arguments separately. "To demonstrate a *prima facie* case for failure to promote, a plaintiff must produce evidence showing that (1) she was a member of a protected class; (2) she was qualified for the position sought; (3) she was rejected for the position; and (4) the employer promoted someone outside of the protected class who was not better qualified for the position." *Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886, 892 (7th Cir. 2016). If Rivers succeeds in demonstrating a *prima facie* case, the burden of production then shifts to Goodwill to articulate a "legitimate nondiscriminatory reason" for not promoting her. *Id.* at 891. If Goodwill can produce evidence of a legitimate, nondiscriminatory reason, the burden shifts back to Rivers to demonstrate the Goodwill's stated reason is a pretext for discrimination. *Id.* at 892.

Goodwill does not dispute the first three elements, and argues only that Rivers has produced no evidence that she was better qualified for the senior director position than Sears. Thus, the Court need not address the first three prongs of the *prima facie* standard. In her deposition, Rivers asserts that she was a superior candidate for the senior director role because of her "[e]ducation, experience, and then meeting the minimum requirements for the role." (Filing No. 37-1 at 151) She also argues that her "previous experience alone was objectively better for the [senior director position] than Sears' experience" because Rivers had spent more time at

Goodwill than Sears, had more retail experience than Sears, and had more eCommerce experience than Sears. (Filing No. 46 at 17-18.)

In response, Goodwill asserts that "courts have rejected arguments by plaintiffs that educational and professional accomplishments trump different, legitimate, and even subjective reasons for hiring and promotion decisions." (Filing No. 36 at 19-20.) It cites *Armstrong v. City of Milwaukee*, a case in which a black employee was denied a promotion that went to someone with thirteen fewer years of experience. 204 Fed. Appx. 559 (7th Cir. 2006). In *Armstrong*, a selection panel gave a promotion to a less experienced employee because they felt that she gave a superior interview. Armstrong argued that "the strength of the 'objective' evidence (that is, presumably, his educational and professional history) creates a genuine dispute of material fact whether he was 'at least as qualified' as the applicant who got the job." *Id.* at 563. The Seventh Circuit rejected that argument, and in doing so said

> [Plaintiff's] attack on the "subjective" reasons for promoting [the other candidate] is meritless; we, along with other courts of appeals, have squarely rejected similar attacks on employers' use of "subjective" criteria, and stated that nothing in Title VII prohibits employers from relying on such criteria when promoting individuals. *See Blise [v. Anataramian]*, 409 F.3d [861,] 868 [(7th Cir. 2005)]; *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1176 (7th Cir. 2002) ("[A] court's role is to prevent unlawful hiring practices, not act as a super personnel department that second-guesses employers' business judgments." [internal quotations omitted].
>
> Reduced to its essence, [plaintiff's] argument that he was "at least" as qualified for the promotions and [the other candidate] relies on nothing more than his own estimation of his qualifications. Such self-serving assertions carry no evidentiary value when attempting to prove racial discrimination….

*Armstrong*, 204 Fed. Appx. at 563.

This argument and law is persuasive. The only evidence designated to show Rivers was better qualified for the senior director position than Sears, is her own deposition testimony and opinion, that she had superior experience and education. (Filing No. 37-1 at 151.) Rivers cites no caselaw that requires Goodwill to base its hiring practices on these two qualifications rather than

11

other, more subjective criteria. The evidence in the record shows that Goodwill went through a thorough screening of the internal candidates for this promotion. Schlegel spoke with members of other Goodwill departments, received recommendations from the candidates' direct supervisors, the internal recruiter, and the panel that conducted the interview. Schlegel placed great weight on Cooper's endorsement of Sears over Rivers and the fact that the panel thought one of Rivers' weak points was "building strategic relationships."

Rivers does not cite any caselaw that indicates these considerations are improper or less relevant than experience and education. The record evidence shows that Goodwill made its promotion decision solely based on legitimate, non-discriminatory reasons. Thus, Rivers has not met her burden of offering evidence to show that Sears was not better qualified for the senior director position. Because Rivers cannot establish a *prima facie* case of gender discrimination the Court **grants** Goodwill's Motion for Summary Judgment as to her claim for gender discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et seq*.

Rivers did not establish a *prima facie* case of gender discrimination, and thus the Court need not address Goodwill's argument that Rivers cannot show Sears' promotion over her was a pretext for discrimination. However, even if she had established a *prima facie* case, Rivers has not shown pretext. In arguing pretext, Rivers asserts that: (1) Sears received additional time to prepare for the panel interview by being allowed to interview on a later date; (2) Sears was not the clear choice because each applicant had their strengths and weaknesses; and (3) the reason for non-selection – that she failed to build strategic relationships – had not been identified as a significant issue in the past. (Filing No. 46 at 19-20).

Each of these arguments fail. Mr. Sears interviewed on a separate day due to a death in his family. Although each candidate was determined to have strengths and weaknesses, Rivers has not

shown that her "credentials so superior to those of the person selected such that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question in order to show that the employer's reasons for the promotion were pretextual." *Murray v. Golden Rules Ins. Co./United Health Corp.*, 23 F.Supp.3d 938, 954 (S.D. Ind. 2014). As to the final factor, Rivers admitted in her deposition that Cooper had identified building Cooper identified building strategic relationships as an area in which Plaintiff needed to improve upon in both her 2015 and 2016 performance reviews.

A party establishes pretext with evidence that the Defendant's stated reason or employment decision "was a lie—not just an error, oddity, or oversight." *Van Antwerp v. City of Peoria, Ill.*, 627 F.3d 295, 298 (7th Cir. 2010). Rivers has not shown that any of these reasons or explanations for not receiving the promotion was a lie, thus she has not shown pretext.

**B. Retaliation**

Rivers alleges that Goodwill "retaliated against her by terminating her employment after she complained of sex/gender discrimination in violation of Title VII of the Civil Rights Act of 1964." (Filing No. 34.) Title VII states that:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees … because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). "[A]n employer may not retaliate against an employee who has complained about discrimination or other employment practices that violate Title VII." *Racicot v. Wal-Mart Stores, Inc.*, 414 F.3d 675, 678 (7th Cir. 2005). Goodwill argues that Rivers' retaliation claim fails for several reasons, including that she cannot establish a *prima facie* case of retaliation. (Filing No. 36 at 24.)

To survive summary judgment on her retaliation claim, Rivers must establish that (1) she engaged in a protected activity; (2) she suffered a materially adverse employment action; and (3) there is a causal link between the protected activity and the employment action. *Cervantes v. Ardagh Grp.*, 914 F.3d 560, 566 (7th Cir. 2019). Goodwill asserts that Rivers has not established either prong (1) or prong (3). Because it is dispositive, the Court will focus on whether there was a causal link between any protected activity Rivers may have engaged in and Sears' decision to terminate her employment.

To prove a claim of retaliation, "the dispositive question [is] whether a reasonable jury could find a but-for causal link between the protected activities and the adverse actions at issue." *Burton v. Bd. of Regents of Univ. of Wisconsin Sys.*, 851 F.3d 690, 697 (7th Cir. 2017). Mere temporal proximity" is insufficient to raise a question of material fact regarding causation. *Tomanovich*, 457 F.3d at 665; *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002); *Miller*, 2014 WL 4259628, at *7. Implicit in the "scheme[] of proof is the necessity of showing that the decision-maker had knowledge of plaintiff's having engaged in some form of protected activity, for without knowledge of such protected activity there can be no showing of an intent to retaliate." *Randall v. Rolls-Royce Corp.*, 742 F.Supp.2d 974, 991 (S.D. Ind. 2010). Goodwill argues that no evidence in the record shows that Sears, who made the decision to terminate Rivers' employment, knew that Rivers complained of gender discrimination.

Rivers recalls expressing to Goodwill that she felt discriminated against based on her gender in 2016, while discussing an unrelated matter with Cooper, she stated there was a "good old boys" environment at Goodwill. The only other occasion is when she told Schlegel that there was a "good old boys club" at Goodwill. (Filing No. 37-1 at 116-17.) At her deposition, Rivers stated that she was "almost 90 percent certain" that she had made the comment to Schlegel. *Id.* at

117. Schlegel testified in his deposition that he did not remember Rivers ever commenting to him that Goodwill had a "good old boys club" or anything of that sort. (Filing No. 37-1 at 76-77.)

Assuming, as it must, that Rivers did make the comment both to Cooper and Schlegel, it would not satisfy her burden of showing a causal connection between protected activity and an adverse employment action because neither of those men made the decision to terminate Rivers employment. The undisputed evidence is that Sears alone made the termination decision and that he did not need, nor did he seek approval from anyone else. *Id.* at 110. Sears admits that she never expressed any complaint directly to Sears. In addition, no evidence shows that Sears was aware of any complaints Rivers had expressed to Schlegel and Cooper that there was an "old boys club" atmosphere.

Rivers argues that there is a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the Defendant." (Filing No. 46 at 23-24.) She contends that the timing of her termination was suspicious because she made the comment about the "good old boys club" to Schlegel two weeks prior. While suspicious timing alone is insufficient to establish a genuine issue of material fact, suspicious timing may permit a plaintiff to survive summary judgment if there is other evidence that supports the inference of a causal link. *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005) ("[w]hen an adverse employment action follows on the close heels of protected expression and the plaintiff can show the person who decided to impose the adverse action knew of the protected conduct, the causation element . . . is typically satisfied"); *Martinez*, 2013 WL 5775082, at *7.

Here, the Court does not agree that the timing of Rivers' dismissal was suspicious. Indeed, the timing seems natural. Rivers had just been denied a promotion, had taken a few days off work, and had told people at Goodwill that she was reconsidering whether she wanted to continue

working there.  Additionally, when Sears became her supervisor the two butted heads because Rivers believed she should have received the promotion instead of Sears.  Sears terminated her employment when she told him she would not report to him until she got some answers about why he had received the promotion from elsewhere in the company.  These events make a logical case for the timing of her termination.  The Court does not find the timing to be suspicious.

Rivers also argues that Sears' stated rationale for her termination—that she would not recognize him as her superior—is a pretext. *Id.* at 25-26.  The only evidence Rivers cites in support of this argument is the fact that she only told Sears once that she would not answer to him, and that she had implied her attitude might change after she got some answers about why he had been promoted instead of her.  But other evidence shows that the two were at loggerheads and that Rivers was not interested in reporting to Sears.  Rivers had asked Schlegel if she could report to him rather than Sears.  And Sears testified that Rivers had twice unequivocally told him that she would not accept him in the role of her supervisor.  ([Filing No. 37-3 at 65-66](Filing No. 37-3 at 65-66).)  The evidence, even when construed in the light most favorable to Rivers, is insufficient to establish that Sears' stated rationale for firing Rivers was a pretext.

Finally, Rivers argues that a reasonable jury could infer that Sears had knowledge of her protected activity or that Schlegel was involved in the decision to terminate Rivers.  The evidence does not support that position.  No evidence, other than Rivers' own speculative deposition testimony, indicates that Schlegel had any input on the decision to terminate her.  In fact, the evidence is in opposite--when Sears consulted Schlegel about his conflict with Rivers, Schlegel instructed him to work it out with Rivers, rather than to terminate her.  No evidence shows that Schlegel informed Sears that Rivers had complained of a "good old boys club" at Goodwill.  Schlegel testified that he does not remember Rivers making the comment at all, and Sears testified

that he was unaware of any complaint Rivers made about gender discrimination. *Id.* at 56. The only evidence that calls that testimony into question is Rivers' unsupported speculation about conversations that may have gone on between Schlegel and Sears.

In summary, the only protected activity Rivers' allegedly engaged in was making one comment to Schlegel about a "good old boys club" at Goodwill. No evidence shows that this single comment was a motivating or a but-for cause of her termination. In fact, no evidence shows that Sears, the person who decided to terminate Rivers, was ever aware of the comment. Because Rivers cannot establish a causal nexus between her protected activity and her termination, she has failed to make a *prima facie* case for retaliation. Thus, the Court **grants** Goodwill's Motion for Summary Judgment as to Rivers' retaliation claim.

## IV. CONCLUSION

For the reasons explained above, the Court **GRANTS** Goodwill's Motion for Summary Judgment ([Filing No. 35](#)) on both claims made by Rivers in her Complaint. This ruling resolves all claims as to all parties. Final judgment will issue in a separate order.

**SO ORDERED.**

Date: 3/30/2020

*[signature]*

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Lauren Elizabeth Berger
BIESECKER DUTKANYCH & MACER LLC (Evansville)
lberger@bdlegal.com

Andrew Dutkanych, III
BIESECKER DUTKANYCH & MACER LLC (Evansville)
ad@bdlegal.com

Justine Farris-Niehaus
BARNES & THORNBURG LLP
Justine.Farris@btlaw.com

David J. Pryzbylski
BARNES & THORNBURG, LLP (Indianapolis)
dpryzbylski@btlaw.com